The LINCOLN NATIONAL BANK, Plaintiff-Appellant,

v.

James F. HERBER and First National Bank of Lake Forest, Defendants-Appellees.

No. 78–2388.

United States Court of Appeals, Seventh Circuit.

Argued June 4, 1979.

Decided Aug. 29, 1979.

Quinton F. Seamons, Robert F. Farrer, Wilson & McIlvaine, Chicago, Ill., for defendants-appellees.

Before CASTLE, Senior Circuit Judge, and CUMMINGS and BAUER, Circuit Judges.

CASTLE, Senior Circuit Judge.

The Lincoln National Bank (Lincoln), unable to collect on loans totalling $842,000 made to one John B. Lampe, seeks to recover the amount of the loans plus interest from defendants—Lampe's other lending bank and its vice president—under the general antifraud provisions of the federal securities laws, § 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)], § 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)], and Rule 10b–5 of the Securities Exchange Commission [17 CFR § 240.10b–5], as well as under the state common law of fraud. The questions before us on this appeal from a grant of summary judgment in favor of defendants First National Bank of Lake Forest (Lake Forest) and James F. Herber are (1) whether the federal securities laws extend to a commercial loan transaction, when the loan is evidenced by promissory notes and secured by stock collateral, and if so (2) whether defendants are liable under the above antifraud provisions. The district court answered the first question in the affirmative and the second in the negative.[1] We affirm the grant of summary judgment in favor of defendants without reaching the second issue addressed by the district court as we conclude that Lincoln lacks standing to sue under § 17(a), § 10(b), or Rule 10b–5. Our holding, of course, does not touch on the merits of Lincoln's cause of action against defendants under the state common law of fraud, which Lincoln is free to pursue in state court.

Section 10(b) and Rule 10b–5 prohibit any fraud "in connection with the purchase or sale of any security." Section 17(a) prohibits fraud "in the offer or sale of any securi-

Barry A. Spevack, and Roger C. Goble, Dent Hampton & McNeela, Chicago, Ill., for plaintiff-appellant.

1. The decision here under review, which grants defendants' motion for summary judgment, is not published. However, Judge Decker's opinion in an earlier phase of the case is published and may be consulted for a fuller exposition of the facts. *Lincoln National Bank v. Lampe*, 414 F.Supp. 1270 (N.D.Ill.1976).

ties."[2] Lincoln claims that these provisions apply to a commercial loan such as the one here involved on two separate theories: (1) that the promissory notes evidencing the debt constitute "securities" which were fraudulently "sold" to it by Lampe or, alternatively, (2) that certain stock certificates (later discovered to be counterfeit) which were pledged by Lampe as collateral for the loan were in effect "sold" by Lampe to the plaintiff bank.

■ The district court disposed of the first argument on the ground that the promissory notes were of a "commercial" rather than "investment" character and hence were not "securities" under the 1933 Act or 1934 Act. We adopt the district court's opinion on this issue, which we believe is in accord with this Court's opinion in *C. N. S. Enterprises, Inc. v. G. & G. Enterprises, Inc.*, 508 F.2d 1354 (7th Cir. 1975).

In the second theory advanced for coverage of the securities laws, the district court found merit, according Lincoln standing to sue under the cited antifraud provisions in its capacity as a pledgee of securities. In support of its holding extending the protection of the securities laws beyond the traditional category of purchasers or sellers of securities, see *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952) and *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the district court cited two recent opinions of the Second Circuit, *Mallis v. Federal Deposit Insurance Corp.*, 568 F.2d 824 (2d Cir.), *cert. granted*, 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243, *cert. dismissed as improvidently granted sub nom. Bankers Trust Co. v. Mallis*, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978), and *United States v. Gentile*, 530 F.2d 461 (2d Cir.), *cert. denied*, 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976). We respectfully disagree with the broad holding of those

two cases that any pledge of a security is a "sale" for purposes of the antifraud provisions of the securities acts.

*Statutory Language*

■ An analysis of the proper scope of the securities laws should begin with the language of the statutes involved. *Touche Ross & Co. v. Redington*, —— U.S ——, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Teamsters v. Daniel, supra*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979). If a pledge is included within the statutory definition of "sale," the present transaction would literally fall within a prohibition of any fraud in the "purchase or sale" of a security, since there is no question that even counterfeit securities such as the ones here involved are "securities" under the 1933 and 1934 Acts. *Seeman v. United States*, 90 F.2d 88, 89 (5th Cir. 1937); *Lincoln National Bank v. Lampe*, 414 F.Supp. 1270, 1277 (N.D.Ill. 1976).

■ The 1933 Act contains no definition of "purchase" but states that "[t]he term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value." The Securities Act of 1933, § 2(3). The 1934 Act contains the following definitions:

(13) The terms "buy" and "purchase" each include any contract to buy, purchase, or otherwise acquire.

(14) The terms "sale" or "sell" each include any contract to sell or otherwise dispose of.

Securities Exchange Act of 1934, §§ 3(a)(13) and (14). At common law, a pledge would be readily distinguishable from a sale since a pledge involves a transfer of possession only, not of title. But the above-quoted statutory definitions of "sale" would appear broad enough to embrace a transfer of a security interest in stock since a "sale" under the 1933 Act includes "every . . . disposition of a[n] . . . interest in a

---

**2.** This Court has held that there exists a private cause of action under § 17(a) of the Securities Act of 1933, *Daniel v. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen and ·Helpers of America*, 561 F.2d 1223, 1244–1246

(7th Cir. 1977), *reversed on other grounds sub nom. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979).

security, for value." The "or otherwise dispose of" language of the 1934 Act definition could also be interpreted to extend to a pledge transaction, and we see no reason not to interpret the definitions of the two acts in the same fashion. *National Bank of Commerce of Dallas v. All American Assurance Co.*, 583 F.2d 1295, 1298 (5th Cir. 1978).

The literal inclusion of pledge transactions within the statutory definition of "sale" is not dispositive of the question before us, however, in view of the provision in both Acts that the definitions apply "unless the context otherwise requires." Securities Act § 2 and Securities Exchange Act § 3. A "context over text" approach to construction of the securities acts has been taken by a number of courts, particularly in determining whether a note constitutes a "security," an issue very similar to the question now before us to the extent that it demands resolution of the proper scope of the securities laws. *See, e. g., C. N. S. Enterprises, supra*; and *McClure v. First National Bank of Lubbock*, 497 F.2d 490 (5th Cir. 1974), .cert. denied, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975). Likewise, the Supreme Court has rejected literal application of the securities laws in favor of an analysis looking to underlying economic realities, see *Teamsters v. Daniel, supra*, and *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), and consistency with the purposes for which the legislation was enacted, see, e. g., *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 35, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977).

As will be more fully developed below, the reality of the transaction here involved is that Lincoln sought to lend money on the security of certain stocks, not to invest in those stocks; and the purpose of the 1933 and 1934 Acts is to protect investors, not secured lenders such as Lincoln.

*The Legislative History*

■ The 1933 and 1934 Acts were passed by the same Congress and should be considered together as one body of law. See *Tcherepnin v. Knight*, 389 U.S. 332, 342, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). It is very clear from the legislative history of the Acts that they were passed to protect the *investor*. The Senate Report on the bill which, with changes, was to become the 1933 Act stated:

The purpose of this bill is to protect the investing public and honest business. The basic policy is that of informing the investor of the facts concerning securities to be offered for sale in interstate and foreign commerce and providing protection against fraud and misrepresentation.

The aim is to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and true information before the investor; to protect honest enterprise, seeking capital by honest presentation, against the competition afforded by dishonest securities offered to the public through crooked promotion; to restore the confidence of the prospective investor in his ability to select sound securities; to bring into productive channels of industry and development capital which has grown timid to the point of hoarding; and to aid in providing employment and restoring buying and consuming power.

It is the conviction of the committee that these aims may be largely achieved upon the basis of fidelity to truth. Confidence must and may be restored upon the enduring basis of honesty with the public.

S.Rep.No.47, 73d Cong., 1st Sess., to accompany S. 875, April 27, 1933. See also H.R. Rep.No.85, 73d Cong., 1st Sess., to accompany H.R. 5480, May 4, 1933; and 77 Cong. Rec. 2983 (1933) (statement of Sen. Fletcher, who introduced the bill.)[3]

The 1933 Act sought to protect the investor from the enormous losses that had been suffered as a result of investing in worthless securities by requiring issuers to furnish prospective investors with full infor-

---

**3.** The legislative history of the 1933 and 1934 Acts is collected in Ellenberger and Mahar, Legislative History of the Securities Act of 1933 and the Securities Exchange Act of 1934 (1973).

mation concerning the new offering prior to selling it.

The 1934 Act extends the full disclosure policy of the 1933 Act to the subsequent trading of securities in the secondary market. In addition, it regulates the securities markets and a variety of practices affecting the securities markets in order to prevent recurrence of the excesses that were viewed as responsible for the stock market crash of 1929.[4] One of the 1934 Act's concerns is with controlling the amount of the nation's credit that goes into the securities markets, but there is no evidence that Congress was concerned with the use of credit for other purposes. Lampe borrowed the $842,000 in order to acquire additional operating capital for Spaco, Inc., which he controlled, and to pay down an outstanding loan of $625,000 from Lake Forest. Use of the funds for such purposes clearly would not affect the securities markets.

The legislative history of the provisions defining "sale" also reveals no hint of a Congressional intent to regulate transactions involving a pledge of securities although this result could easily have been achieved by including pledges within the definition of "sale" as was done in the Public Utility Holding Company Act of 1935. See 15 U.S.C. § 79b(a)(23) (definition) and 15 U.S.C. § 79l(d) (antifraud provision). The definition of "sale" was not a topic to which much attention was devoted during the course of the hearings on the Acts, but considerable legislative effort was nevertheless expended in drafting the definition, as evidenced by the length of the original definition, which was gradually pared down until it reached its present form.[5] Though quite comprehensive, the original definition significantly did not contain any reference to pledge transactions. Likewise, a thorough discussion of the term "sale" in the House Report on the bill does not mention pledge transactions at all.[6]

In sum, Congress's intent was to regulate investment transactions and transactions affecting the securities markets, not commercial loan transactions such as the one here involved which would have no impact on the securities markets.

*"Commercial" v. "Investment" Risk*

In *Mallis* and *Gentile, supra,* the Second Circuit reasoned that in conditioning a loan on the taking out of a security interest in stocks belonging to the borrower, a bank is making an investment decision because it is assuming the risk that the stock has value and will continue to have value. We do not dispute the existence of a risk; however the risk is taken for the purpose of making a loan, not for the purpose of investing in the securities. It is true that the bank may acquire title to the securities in the event of default, but the bank enters in to the transaction in the first place upon the calculated risk that default will not occur. The purpose or motive of a transaction has been given controlling weight by the Supreme Court in two recent cases. In *United Housing v. Forman, supra,* the Court held that shares in a housing cooperative were not "securities"—even though the possibility of profit existed from the leasing of commercial and professional space, tax benefits, and government subsidies—because tenants bought the shares in order to acquire housing, not in order to participate in the profits of the cooperative. In *Teamsters v. Daniel, supra,* the Court held that an employee's participation in a noncontributory, compul-

---

**4.** Professor Loss has stated that the 1934 Act has four basic purposes:

> to afford a measure of disclosure to people who buy and sell securities; to prevent and afford remedies for fraud in securities trading and manipulation of the markets; to regulate the securities markets; and to control the amount of the Nation's credit which goes into those markets.

I Loss, Securities Regulation 130–131 (1961 ed.).

**5.** The history of the 1933 Act's definition of "sale" can be traced through S. 875 and H.R. 4314; S. 875 as reported to the Senate (S.Rep. No.47, 73d Cong., 1st Sess., April 27, 1933) and H.R. 5480 as reported to the House (H.R.Rep. No.85, 73d Cong., 1st Sess., May 4, 1933); and then the final version as enacted in the 1933 Act as § 2(3) and amended in 1954. All these documents can be found in Ellenberger and Mahar, *supra* note 3.

**6.** H.R.Rep.No.85, *supra,* at pp. 11–12.

sory pension plan did not constitute a "security" or "investment contract" because in taking the job the employee seeks to obtain a livelihood, not to make an investment for the future. In both of these cases, the securities laws could have been found to apply in a literal sense, but the Court looked to the underlying economic realities of the transactions. One transaction was primarily a housing transaction, the other was an employment transaction—neither was entered into as an investment, although that may have been an incidental benefit. Similarly here we have a loan transaction, and the possibility that the lender may end up owning the securities in the event of default does not change the basic character of the transaction. In *United Housing* the Court recognized that there are different kinds of risk, 421 U.S. at 857 n. 24, 95 S.Ct. 2051, and we hold that the risk here assumed by Lincoln was not an investment risk but the ordinary commercial risk incident to a loan transaction.

Without analyzing the legislative history or placing the definition of "sale" within the context of the Congressional concerns addressed by the securities legislation of 1933 and 1934, the *Gentile* and *Mallis* decisions adopted a literal reading of the definition.

In *Gentile*, the Second Circuit sustained defendant's conviction on a number of counts of securities fraud under the 1933 Act, including a count alleging fraud in connection with the pledge of securities as collateral for a bank loan. The pledge transaction was found to be covered by § 17(a)'s prohibition of fraud in the "sale" of a security. The court reasoned, first, that the 1933 Act definition of "sale" literally included a pledge of a security and that a court should not go beyond the literal language of the statute in a criminal case. Secondly, it relied on *SEC v. Guild Films Company, Inc.,* 279 F.2d 485 (2d Cir.), *cert. denied sub nom. Santa Monica Bank v. SEC,* 364 U.S. 819, 81 S.Ct. 52, 5 L.Ed.2d 49 (1960), which had held that "sale" included pledges in the course of holding that a pledgee could not sell stock collateral to the public, having originally accepted the collat-

eral with the intention of so doing, without becoming a statutory "underwriter" subject to the registration requirements of the 1933 Act. The case has been much criticized on the ground that its broad holding on the "sale" issue was not necessary in view of the court's finding that the pledgee accepted the stock in bad faith with a view to distributing it. *See, e. g.,* I Loss, Securities Regulation 645–651 (1961 ed.). A decision relating to a bad faith pledge and the registration requirements of the 1933 Act has no bearing in a case involving a pledge accepted in good faith and arising under the antifraud provisions of the securities acts. In *SEC v. National Securities, Inc.,* 393 U.S. 453, 466, 89 S.Ct. 564, 571–72, 21 L.Ed.2d 668 (1969), the Court said:

> The meaning of particular phrases must be determined in context. . . . Congress itself has cautioned that the same words may take on a different coloration in different sections of the securities laws; both the 1933 and 1934 Acts preface their lists of general definitions with the phrase "unless the context otherwise requires."

Finally, the *Gentile* court reasoned that the risk taken by the holder of securities collateral that the securities will maintain their value is a risk identical to the risk taken by the investor. 530 F.2d at 467. As pointed out above, we disagree with this analysis. Risk there is, but the risk is not an *investment* risk. It is the ordinary *commercial* risk taken by any secured lender. The risk that the pledgor does not own the collateral he purports to own exists no matter what the nature of the collateral.

In *Mallis* the Second Circuit again held that a pledge of stock constitutes a "sale," this time in a civil action under the antifraud provisions of both the 1933 and 1934 Acts. The facts of that case, however, were very different from the facts now before us. Two dentists lent $156,000 to a lawyer and his client in order to enable the latter to purchase shares of Equity National Industries, Inc., owned by the Kates but held in an escrow account by Bankers Trust

Company. In knowing violation of the terms of the escrow agreement requiring return of the shares to Equity National for cancellation, Bankers Trust released the shares so that the Kates could sell them to the lawyer. The latter in turn pledged the shares to the dentists as security for the loan. The lawyer defaulted, and it turned out that the shares were worthless since they had been cancelled by Equity National. The dentists then sued Bankers Trust for fraud in connection with the sale of a security. *Mallis* is distinguishable from the present case because there was a sale of securities, so there is no question that the purchaser could sue under the antifraud provisions. The only question is who the real purchaser was. Although the lawyer was the nominal purchaser, the dentists furnished all the money and are the ones who are "out of pocket" on the transaction. Regardless of the resolution of the latter issue, the fraud in *Mallis* was "in connection with the . . . sale of [a] security" whereas the very question which must be answered in the present case is whether there was a "sale" at all.

In rejecting the approach of the Second Circuit, we agree with the Fifth Circuit's position in *National Bank of Commerce of Dallas v. All American Assurance Co.*, 583 F.2d 1295 (5th Cir. 1978), and *McClure v. First National Bank of Lubbock*, 497 F.2d 490 (5th Cir. 1974), *cert. denied*, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975), that a "sale" of the securities does not occur at the time the securities are pledged. It is possible that a sale may occur at a later point if the pledgee in fact forecloses on the stock after default on the loan, for then title actually passes and the pledgee becomes an unwilling purchaser of the stock. We do not address the question of whether a "purchase" takes place upon foreclosure, however, for here there has been no foreclosure, and we decline to adopt the district court's doctrine of "constructive foreclosure." See 414 F.Supp. at 1278.

*State Regulation of Secured Transactions Involving Securities Collateral*

The final consideration counselling against extension of the antifraud provisions of the 1933 and 1934 Acts to the situation where securities are fraudulently pledged as collateral for a bank loan is that state law already extensively occupies the field. This would be a further indication that Congress never intended to extend the antifraud provisions to pledge transactions as well as a sound policy reason not to extend the federal securities laws into this area, as there is no apparent need.

Article 9 of the Uniform Commercial Code, adopted in Illinois, regulates secured transactions, including those involving securities collateral. See UCC §§ 9–102(1)(a) (Article applies to security interests in "instruments") and 9–105(1)(i) ("instrument" includes a security). Among other provisions, Article 9 defines the rights, duties, and remedies of a pledgee upon default. §§ 9–501 to 9–507. Article 8, regulating transfers of investment securities, would also apply. Various provisions of this article would pertain to the rights of a "purchaser" of counterfeit securities. §§ 8–301, 8–306, 8–316, 8–320. A "purchaser" is expressly defined as including a pledgee. §§ 1–201(32) and (33).[7] In addition to any state rights or remedies afforded Lincoln under the UCC, it can pursue its claim against defendants under the state common law of fraud or any other applicable provision of law.

State regulation of a field and the availability of remedies under state law have both been considered by the Supreme Court in a number of recent decisions declining to imply a private right of action under various sections of the securities laws. *See, e. g., Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977); *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

---

7. Illinois law would apply as all the parties reside in Illinois and the alleged fraud took place in Illinois. The Uniform Commercial Code, including articles 8 and 9, is codified at chapter 26 of the Illinois Revised Statutes (1977).

*Conclusion*

■ In sum, the legislative history of the 1933 and 1934 Acts is devoid of any indication of an intent to regulate pledges of securities; the Second Circuit decisions extending the Acts to such transactions are distinguishable, and to the extent they are not we disagree with their conclusion that a pledgee of stocks takes an "investment" risk; state law adequately covers the area; and recent Supreme Court decisions have manifested a reluctance to expand the federal securities laws absent a clear indication of Congressional intent or a need to do so to accomplish the purposes of the legislation. We therefore hold that a pledge of securities is not a "sale" for purposes of invoking the antifraud provisions of the 1933 and 1934 Acts.

The decision of the District Court granting defendants' motion for summary judgment is AFFIRMED.