635 F.2d 1247
 Blue Sky L. Rep. P 71,575, Fed. Sec. L. Rep. P 97,681
AMERICAN FLETCHER MORTGAGE COMPANY, INC., and American
Fletcher National Bank and Trust Company,
Plaintiffs-Appellees,
v.
U. S. STEEL CREDIT CORPORATION, Defendant-Counterclaimant (Appellant),
v.
AMERICAN FLETCHER MORTGAGE COMPANY, INC., American Fletcher
National Bank and Trust Company and American
Fletcher Corporation, Counterdefendants
(Appellees).
 Nos. 80-1485, 80-1719.
 United States Court of Appeals,
Seventh Circuit.
 Heard Sept. 23, 1980.
Decided Nov. 3, 1980.
Rehearing and Rehearing En Banc Denied Dec. 3, 1980.
 
 William A. Wick, Indianapolis, Ind., for defendant-counterclaimant (appellant).
 Theodore R. Boehm, Indianapolis, Ind., for plaintiffs-appellees.
 Before CUMMINGS and WOOD, Circuit Judges, and CAMPBELL, Senior District Judge.*
 CUMMINGS, Circuit Judge.
 
 
 1
 In this diversity case, defendant U. S. Steel Credit Corporation appeals in No. 80-1719 from the district court's interlocutory orders denying defendant's motion for partial summary judgment on plaintiffs' amended and supplemental complaint and defendant's motion for a summary judgment declaring the loan participations in issue to be "securities" within the meaning of federal and Indiana securities laws, and in No. 80-1485 from the district court's final order dismissing the securities fraud counts of defendant's amended counterclaim. We affirm.
 
 I. Introduction
 
 2
 On April 10, 1976, plaintiffs brought this action to recover monies allegedly disbursed on behalf of defendant U. S. Steel Credit Corporation (Steel) pursuant to certain loan participation agreements. The facts according to the amended and supplemental complaint are as follows:
 
 
 3
 In 1973, the American Fletcher Mortgage Company (Mortgage Company) agreed to make two loans totaling $5,820,000 to Justin Development Corporation to acquire land in Cromwell, Connecticut, and construct residential condominiums thereon. In the same year the Mortgage Company entered into participation agreements with defendant Steel, American Fletcher National Bank (Bank) and American Fletcher Mortgage Investors Trust (Trust). Those three institutions agreed to supply the funds to the Mortgage Company for disbursement to the borrower in shares of 40% by Steel, 10% by the Bank, and 50% by the Trust. The three participants were to receive payments of principal and interest from the borrower equal to their proportionate shares of the loans.
 
 
 4
 In 1974-1975, the project encountered adverse economic conditions. Therefore, in March 1975 the Mortgage Company proposed an increase of the loans to provide necessary funds. By the end of April 1975, the Mortgage Company's proposal had been approved by the Bank and the Trust, but not by Steel, which failed to respond to the proposal throughout the summer of 1975. Consequently, the Mortgage Company was unable to implement the proposal, and the borrower fell into default on its obligations to the lenders and its general contractor.
 
 
 5
 On October 10, 1975, the Mortgage Company, with the consent of the three participants, entered into a settlement with Justin, its general contractor and the loan guarantors. Under the settlement, the Mortgage Company took title to the project and disbursed funds due the general contractor and various creditors of Justin and generally released Justin, the general contractor and the guarantors. At that time, less than 50 of the project's units had been completed and the rest were still under construction. No sales could be closed without the prompt completion of additional units. After the settlement, Steel demanded that the Mortgage Company purchase its interest at an inflated price.
 
 
 6
 In conjunction with the settlement and prior thereto, the Mortgage Company disbursed $734,929.59 from loan proceeds on behalf of the three participants. Steel has failed to reimburse the Mortgage Company in the amount of $293,962.83, its 40% share of the disbursements, which the Mortgage Company claims to have been due from Steel as of October 16, 1975. As of February 28, 1978, the Mortgage Company had expended an additional $400,541.73 to preserve the project, and Steel therefore allegedly also owes the Mortgage Company 40% of those expenditures, namely $160,216.69.
 
 
 7
 In March 1976, the Mortgage Company made a formal proposal to Steel to develop the project by constructing certain condominium units and engaging in an April 1976 marketing program. Steel did not respond to the proposal, which was approved by the Trust and the Bank, until after the summer of 1976, by which time the prime construction and selling season had passed, thereby resulting in a further decline in the project's value.
 
 
 8
 In January 1977, Steel gave conditional agreement to a proposal to list the project for sale "as is" for $1,700,000. For the next three months, however, Steel refused to give its formal consent unless the Mortgage Company, the Bank and the Trust agreed to waive all claims they had against Steel. This further delayed disposition of the project so that the Mortgage Company was unable to find a buyer even at the $1,700,000 price.
 
 
 9
 The plaintiffs then proceeded to file their amended and supplemental complaint. In Count I, the Mortgage Company sought damages of $454,179.52[1] (plus additional damage sustained after February 28, 1978) plus interest and costs for Steel's alleged breach of its express and implied obligations under the participation agreements. The Bank, as a third-party beneficiary and as assignee of the third-party beneficiary Trust, also requested judgment on this Count for damages in an unspecified amount.
 
 
 10
 In Count II, the Mortgage Company sought the same amount of damages as under Count I plus $1,000,000 punitive damages for Steel's alleged interference with the Mortgage Company's contractual relationships with the Bank and Trust. The Bank on the same theory requested compensatory damages plus $3,000,000 punitive damages.
 
 
 11
 In Count III, the Bank, in its own right and as assignee of the Trust, requested actual damages plus punitive damages of $3,000,000 for Steel's alleged breaches of its duties to the Bank and Trust as co-participants in the financing of the project.[2]
 
 
 12
 On January 8, 1979, Steel filed an amended counterclaim against plaintiffs and an amended claim against counterdefendant American Fletcher Corporation (AFC), the parent corporation of the plaintiffs. In Count I of this pleading, Steel alleged that on October 1, 1973, the Mortgage Company forwarded to Steel participation offerings in loans for the acquisition and construction of the condominium project in Cromwell, Connecticut. In this pleading Steel described the participation offerings as securities as defined in Section 3(a)(10) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(10)) and in Section 2(1) of the Securities Act of 1933 (15 U.S.C. § 77b(1)). Steel accepted these "Security Offerings" on October 27, 1973, by executing and sending the Mortgage Company two participation agreements. Both participation agreements were executed by the Mortgage Company and dated December 31, 1973.
 
 
 13
 Steel asserted that its acceptance was conditioned upon the understanding that the Mortgage Company would not close the Cromwell loans or call upon Steel to make disbursements until Justin had complied with all conditions precedent under the loan agreements. According to Steel, the Mortgage Company closed the loans even though Justin had not satisfied the conditions precedent. Steel claims that it was therefore not bound to advance any monies on the Cromwell loans and that its advances in response to the Mortgage Company's draw requests constituted an investment in securities governed by Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)), S.E.C. Rule 10b-5 (17 C.F.R. § 240.10(b)-5) and Section 17 of the Securities Act (15 U.S.C. § 77q).
 
 
 14
 Steel further alleged that at the time the participation agreements were entered into and during the period prior to mid-June 1975, the Mortgage Company had misrepresented certain material facts and omitted to disclose certain other facts in violation of Section 10(b) of the 1934 Act, S.E.C. Rule 10b-5 and Section 17 of the 1933 Act, causing Steel to advance $2,306,448.07 to the Mortgage Company pursuant to the agreements. In Count I Steel accordingly sought that amount in damages plus prejudgment interest and costs.
 
 
 15
 Counts V-VIII asserted securities claims in the same amount against the Bank and AFC as "controlling persons" and aiders and abettors of the Mortgage Company's alleged securities law violations.[3] By a second amendment on April 10, 1979, Steel added Counts IX-XI, alleging similar violations of the Indiana "Blue Sky" law (§§ 23-2-1-12 and 23-2-1-19(a) of the Indiana Code).
 
 
 16
 On March 20, 1980, the district court denied Steel's motion for partial summary judgment on Counts I, II and III of the amended and supplemental complaint and subsequently issued a certificate for interlocutory appeal under 28 U.S.C. § 1291. On April 24, we granted leave to appeal, and that portion of the case was docketed here as No. 80-1719.
 
 
 17
 On March 21, 1980, the district court granted plaintiffs' motion to dismiss or for judgment on the pleadings on the securities fraud counts (Counts I, V-XI) of Steel's amended counterclaim. This final judgment was based on Judge Steckler's conclusion that the loan participation interests were not securities within the meaning of the federal and state securities laws. At the same time, in an interlocutory ruling, Steel's cross-motion for summary judgment declaring the loan participations to be securities was denied as moot by reason of the holding on the motion to dismiss. Steel's appeal from the dismissal of its securities claims was docketed here as No. 80-1485. Leave to appeal the denial of summary judgment to Steel on the "securities" issue was granted in our April 24 order, and that appeal was therefore docketed with the other interlocutory appeal under No. 80-1719.
 
 
 18
 II. Denial of Partial Summary Judgment on Plaintiffs' Claims Was Appropriate.
 
 
 19
 A. Count I of Amended and Supplemental Complaint
 
 
 20
 As noted above, the Mortgage Company and the Bank, as a third-party beneficiary and assignee of the third-party beneficiary Trust, sued in Count I on a breach of contract theory. Steel moved for summary judgment with respect to the Bank on the argument that the Bank and Trust were not third-party beneficiaries of its participation agreement with the Mortgage Company.[4] Judge Steckler held that there was a genuine issue of fact as to whether the participation agreements were intended to benefit the Bank and Trust and therefore denied the motion (Steel App. 8-9). Steel contends this holding was erroneous because an intent to benefit the Bank and Trust does not "affirmatively appear from the language of the document" as required by Indiana law. We disagree.
 
 
 21
 The contractual obligation on which the Bank and Trust predicate their claims is "Steel's duty to cooperate in efforts to protect the project and minimize loss-and the concomitant duty not to submarine the project to further its own hand" (Plaintiffs' Br. 41). They rely on the clause in the participation agreements requiring Steel to reimburse the Mortgage Company for all extraordinary out-of-pocket costs and expenses incurred "for the protection and preservation of security, for the minimizing of loss * * * " (Steel App. 104, 106). In addition, there is, of course, an implied covenant of good faith and fair dealing by Steel. Photovest Corp. v. Fotomat Corp., 606 F.2d 704, 727-729 (7th Cir. 1979), certiorari denied, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601; Lesh v. Trustees of Purdue University, 124 Ind.App. 422, 116 N.E.2d 117, 120 (1953); Indiana Code § 26-1-1-203; 5 Williston on Contracts § 670, p. 159 (3d ed. 1961).
 
 
 22
 The Bank and Trust had a combined participation interest of 60% in the Cromwell project and stood to incur 60% of the losses. The participation agreements between Steel and the Mortgage Company expressly state that this 60% interest belonged to the Bank and Trust, not the Mortgage Company (Steel App. 103, 105). Thus Steel's obligation to minimize loss would "necessarily and within the contemplation of the parties result in a direct benefit to" the Bank and Trust. Jackman Cigar Mfg. Co. v. John Berger & Son Co., 114 Ind.App. 437, 52 N.E.2d 363, 367-368 (1944). Indeed, as plaintiffs point out, it is difficult to see whom the minimization of loss clause was intended to benefit if not the three risk-bearers.
 
 
 23
 For the foregoing reasons, we cannot agree with Steel that any benefit flowing from the contracts to the Bank and Trust was as a matter of law merely incidental. At best from Steel's viewpoint, the contract is ambiguous as Judge Steckler concluded, and therefore the question whether the contractual language in the circumstances of the transaction evidences an intent to benefit the Trust and Bank is an appropriate one for trial. See Jackman Cigar Mfg. Co. v. John Berger & Son Co., supra; Standard Land Corp. of Indiana v. Bogardus, 154 Ind.App. 283, 289 N.E.2d 803, 824-825 (1972); Shahan v. Brinegar, Ind.App., 390 N.E.2d 1036, 1041 (1979). Furthermore, we agree with plaintiffs that what is at issue here is the question who are the real parties-in-interest. If it is found at trial that the parties did not intend to benefit the Bank and Trust, that would not, of course, alter the Mortgage Company's capacity to sue in Count I for Steel's alleged breach of its duty of good faith. Rule 17(a), Fed.R.Civ.Pro.
 
 
 24
 B. Count II of Amended and Supplemental Complaint
 
 
 25
 In Count II plaintiffs assert that Steel through its dilatoriness interfered with the contractual relationships between the Mortgage Company, the Trust and the Bank,[5] justifying an award of compensatory and punitive damages to the Mortgage Company and the Bank in its own right and as assignee of the Trust. Steel moved for summary judgment on this Count with respect to the Bank and Trust, arguing that its alleged delaying tactics did not cause the Mortgage Company to breach any agreement with the Bank or Trust and that without an actual breach plaintiffs' claim will not lie under Indiana law.
 
 
 26
 Steel relies on the fact that the tort of "interference with contractual relationship by inducing a breach of contract" recognized by Indiana law requires an actual breach. The question before the district court, however, was whether "Indiana law recognizes the more loosely defined tort of tortious interference with contractual or business relations without an actual breach of contract" (Steel App. 9).
 
 
 27
 Since Indiana case law apparently gives no definitive answer to this question, Judge Steckler properly proceeded to attempt to determine how the Indiana courts would decide the question if confronted with it. In concluding that the Indiana courts would recognize such a tort, he relied on Spier v. Home Insurance Co., 404 F.2d 896, 898 (7th Cir. 1968); Martin v. Platt, Ind.App., 386 N.E.2d 1026, 1027 (1979); and Gibson v. Miami Valley Milk Producers, Inc., 157 Ind.App. 218, 299 N.E.2d 631 (1973), all of which lend support to his position.[6] He also observed that the commentators recognize the broader tort. E. g., Restatement (Second) of Torts § 766A (1979) and Comment c thereto; Prosser, Law of Torts § 129 (4th ed. 1971).
 
 
 28
 Steel cites no authority to the contrary. Kiyose v. Trustees of Indiana University, 166 Ind.App. 34, 333 N.E.2d 886 (1975), and Martin v. Platt, supra, on which Steel principally relies, stand for the proposition that only a third party, and not a party to the underlying contract, may be liable for tortious interference. Count II does not, however, allege interference with the contract between the Mortgage Company and Steel. With respect to the contracts between the Mortgage Company and the Bank and Trust, Steel is a third party. Since we find no reason to disagree with Judge Steckler's conclusion that a claim for tortious interference without an actual breach of contract would be recognized under Indiana law, we affirm his denial of Steel's motion with respect to Count II.
 
 
 29
 C. Count III of Amended and Supplemental Complaint
 
 
 30
 In Count III, the Bank, again in its own right and as assignee of the Trust, is seeking actual damages according to proof and punitive damages of $3,000,000 based on Steel's alleged breach of its obligations as a co-loan participant to the other participants. Steel's objection to this Count is that it had no legal relationship to the Bank or Trust and therefore no legal obligations to them. Judge Steckler refused to grant summary judgment for Steel on the ground that "if plaintiffs can substantially substantiate their third-party claim, a contractual relationship giving rise to the duty to act in good faith toward each other would exist" (Steel App. 11). Since Steel concedes the district court's point (Br. 59), its argument here must be taken as an extension of the argument we rejected with respect to Count I, namely, that the Bank and Trust are as a matter of law not third-party beneficiaries of the agreement between the Mortgage Company and Steel.
 
 
 31
 The bank further argues in support of the district court's ruling that the three participants became real estate developers when the Mortgage Company acquired title to the Cromwell project in settlement with the borrower. Steel's dilatoriness in 1976, 1977 and 1978 is relied upon to show that the Bank and Trust sustained damages equal to 60% of the difference between the project's April 1978 value "and the value it would have had if the Mortgage Company had been able to implement its proposals to move forward with and/or dispose of the project" (Steel App. 99). Indiana law has long recognized the duty of a party engaged in a common enterprise to act in the utmost good faith toward its co-venturers. Grover v. Marott, 192 Ind. 552, 136 N.E. 81, 85 (1922). For this reason and that stated by Judge Steckler, the district court properly denied Steel's motion for partial summary judgment with respect to Count III.
 
 
 32
 Accordingly, we affirm the district court's order of March 20 in its entirety.[7] Our ruling does not mean, of course, that Steel may not prevail on any or all of the three Counts after trial.
 
 
 33
 III. The Loan Participations Are Not Securities.
 
 
 34
 In its March 21 order, the district court, finding that Steel's participation in the loans to Justin did not constitute the purchase of a "security" within the meaning of the federal and Indiana securities laws, granted plaintiffs' motion to dismiss or for judgment on the pleadings on the securities fraud counts of Steel's amended counterclaim against the Mortgage Company and the Bank and Steel's amended claim against AFC. It therefore denied as moot Steel's cross-motion for a summary judgment declaring the loan participations to be securities.
 
 
 35
 It is undisputed that for the purposes of this appeal the term "security" is the same under the Securities Act of 1933, the Securities Exchange Act of 1934 and the Indiana "Blue Sky" Act. "Unless the context otherwise requires," these laws apply to "any note * * * or participation in any profit-sharing agreement * * *." 15 U.S.C. §§ 77b(1) and 78c(a)(10); Indiana Code § 23-2-1-1(k). Because of the qualifying phrase, literal inclusion in the statutory list of potential securities is not the test for a "security." Whether a security is involved or not depends upon the economic realities of the transaction in light of Congressional intent. United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 848, 849, 95 S.Ct. 2051, 2058, 2059, 44 L.Ed.2d 621; Canadian Imperial Bank of Commerce Trust Co. v. Fingland, 615 F.2d 465, 469 (7th Cir. 1980).
 
 
 36
 Steel appears to concede that the notes from Justin were not themselves securities (Br. 20-30). That concession conforms to our decision in C.N.S. Enterprises, Inc. v. G & G Enterprises, Inc., 508 F.2d 1354 (7th Cir. 1975), certiorari denied, 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40. In turn, the Mortgage Company and the Bank concede that a participation may be a security even though the underlying note is not (Br. 8 n. 3). Therefore, the sole issue here is whether Steel's loan participation was a security under the quadruple test developed by the case law for determining the existence of a security. A brief look at the transaction here in light of that test makes clear that the loan participations were not securities.
 
 
 37
 Under Forman, supra, four elements are required for a security: (1) an investment, (2) in a common venture, (3) premised upon a reasonable expectation of profits, (4) to be derived from the entrepreneurial or managerial efforts of others. 421 U.S. at 852, 95 S.Ct. at 2060, see also S.E.C. v. W. J. Howey, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244. Here the only element present is a common venture, and that alone is insufficient.
 
 
 38
 The documents executed by the Mortgage Company and Steel recite that the Mortgage Company is the holder of loan obligations evidenced by promissory notes, indicating that this was a collateralized commercial loan with the return to Steel to be in the form of repayment of principal plus interest. Steel itself drafted the participation agreements, which were on typical lenders' forms, and the loan officer for Steel who prepared the loan proposal based his recommendation that the loans be made on the existence of a first mortgage on the property and improvements, the Bank's recommendation concerning the borrower, and the personal guarantees of Justin's principals (Plaintiffs' App. 3). Borrowing for a designated purpose (here the Justin project) and a short note maturity, here three years, are indicia of a commercial loan rather than an investment. C.N.S. Enterprises, supra, 508 F.2d at 1361. To be sure, the loan was risky, but the risk taken was "the ordinary commercial risk taken by any secured lender," not an investment risk. Lincoln National Bank v. Herber, 604 F.2d 1038, 1043 (7th Cir. 1979).
 
 
 39
 The fact that the loan bore interest does not make it a security. Canadian Imperial Bank of Commerce Trust Co. v. Fingland, supra, 615 F.2d at 470; C.N.S. Enterprises, Inc. v. G & G Enterprises, Inc., supra, 508 F.2d at 1359. Steel was not to participate in any of the profits from the Justin project, and neither the repayment of the loan nor the rate of return was in any way dependent on the actual profits, if any, of the project. Instead, it was fixed at a specific rate above prime. In short, this is not an investment premised upon a reasonable expectation of profits but rather a commercial real estate loan transaction.
 
 
 40
 This Court recently held that Congress did not intend to regulate commercial loan transactions that would have no impact on the securities markets. Lincoln Nebraska Bank, supra, 604 F.2d at 1042. Thus in the absence of an investment transaction or impact on the securities market, the term "security" is not applicable to commercial loans including the one in issue here. See Emisco Industries, Inc. v. Pro's Inc., 543 F.2d 38, 39 (7th Cir. 1976); National Bank of Commerce v. All American Assurance Co., 583 F.2d 1295, 1301 (5th Cir. 1978). The cases that Steel relies on to the contrary are those in which courts in the Second Circuit found securities because of the literal language of the statutes.[8] The literal language approach has been rejected by the Supreme Court as well as this Court. Forman, supra, 421 U.S. at 848, 849 n. 14, 95 S.Ct. at 2058, 2059 n. 14, C. N. S. Enterprises, supra.
 
 
 41
 Steel's reliance on its lead lender, the Mortgage Company, for credit evaluations and day-to-day monitoring of the loan does not, as Steel argues, convert its loan participations into securities. Steel in fact conducted its own investigations of the project, and the extent of its control over management of the loan belies its suggestion that it was dependent on the Mortgage Company's entrepreneurial efforts in this venture. Steel retained the rights of a lender to demand foreclosure, preclude substitution or release of collateral, prevent modification of terms of loan obligation, and so on. In any event, Steel's decision to enter the participation agreement was based on its own business judgment, and, as already noted, the loan was collateralized and guaranteed by the principals of the development corporation. The interest on the loan did not derive from the Mortgage Company's entrepreneurial services within the meaning of Forman but from the underlying notes.
 
 
 42
 Accordingly, we hold that Judge Steckler did not err in holding that the Mortgage Company, the Bank and AFC were entitled to dismissal or judgment on the pleadings as to Counts I and V-XI of the final Steel counterclaim and in denying Steel's cross-motion for summary judgment on the ground that its participation interests were not securities within the meaning of the federal and Indiana Acts.
 
 
 43
 The orders of March 20 and 21, 1980, are affirmed. Steel's motion for reassignment of trial judge is denied.
 
 
 
 *
 The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation
 
 
 [1]
 This sum represents the $293,962.83 due the Mortgage Company as of October 16, 1975, and the $160,216.69 due the Mortgage Company as of February 28, 1978. These amounts reflect Steel's 40% share of the disbursements by the Mortgage Company
 
 
 [2]
 A fourth count, alleging abuse of process, was dismissed by stipulation on January 31, 1980 (R. Vol. II at 382). The fourth count of Steel's amended counterclaim also alleged abuse of process and was dismissed by the same stipulation
 
 
 [3]
 Counts II and III, alleging common law fraud and breach of contract, are not in issue here. Count IV, alleging abuse of process, was dismissed by stipulation. See note 2 supra
 
 
 [4]
 Steel suggests in its reply brief that it is entitled to summary judgment against the Bank individually and as assignee of the Trust as to plaintiffs' Counts I, II and III because Steel had repudiated the participation agreements (Reply Br. 16-17). Since this argument was not made below nor indeed in Steel's principal brief here, we will not consider it
 
 
 [5]
 The contracts in question are the Mortgage Company's participation agreements with the Bank and Trust and its management agreement with the Trust
 
 
 [6]
 See also Helvey v. O'Neill, 153 Ind.App. 635, 288 N.E.2d 553, 560-561 (1972)
 
 
 [7]
 This appeal does not question the district court's denial of Steel's motion to strike paragraphs 7, 12 and 13 of the amended and supplemental complaint
 
 
 [8]
 See Commercial Discount Corp. v. Lincoln First Commercial Corp., 445 F.Supp. 1263 (S.D.N.Y.1978) and NBI Mortgage Investment Corp. v. Chemical Bank (1976-1977) Fed.Sec.L.Rep. (CCH) P 95,632 (S.D.N.Y.1976) and (1977-1978) Fed.Sec.L.Rep. (CCH) P 96,066 (S.D.N.Y.1977), both following the literal language approach of Exchange Nat'l Bank v. Touche Ross & Co., 544 F.2d 1126 (2d Cir. 1976). Steel also relies on Lehigh Valley Trust Co. v. Central Nat'l Bank of Jacksonville, 409 F.2d 989 (5th Cir. 1969). But see National Bank of Commerce v. All American Assurance Co., supra, 583 F.2d at 1300-1301; Bellah v. First National Bank of Hereford, 495 F.2d 1109, 1111-1116 (5th Cir. 1974); McClure v. First Nat'l Bank of Lubbock, 497 F.2d 490, 492-495 (5th Cir. 1974), certiorari denied, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 which abandon the literal approach. See also Morsey v. Green (S.D.Fla. No. 76-8044 CA, decided March 28, 1978), affirmed without opinion, 615 F.2d 917 (5th Cir. 1980), certiorari denied, --- U.S. ----, 101 S.Ct. 270, 66 L.Ed.2d 131