569 F.Supp. 310 (1983)
SHELTER MUTUAL INSURANCE COMPANY, Plaintiff,
and
Traders Bank of Kansas City, Plaintiff-Intervenor,
v.
PUBLIC WATER SUPPLY DISTRICT NO. 7 OF JEFFERSON COUNTY, MISSOURI, et al., Defendants.
No. 81-1352C(A).
United States District Court, E.D. Missouri, E.D.
June 17, 1983.
*311 Edwin D. Akers, Gregory H. Wolk, Alan G. Johnson, Gallop, Johnson & Neuman, St. Louis, Mo., for plaintiff.
Jim Shoemake, Thomas Guilfoil, John O'Neil, Guilfoil, Symington Petzall & Shoemake, St. Louis, Mo., for Traders Bank of Kansas City, plaintiff-intervenor.
Richard Sher, Michael Hart, Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, Mo., for Frank Payne.
F. Russell Millin, Kansas City, Mo., for Jack L. Perry & Kenneth Adams.
Robert S. Allen, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for Stinson, Mag, Thomson, McEvers & Fizzell.
Ralph Kleinschmidt, Evans & Dixon, St. Louis, Mo., for Gregory D. O'Shea.
William Rutherford, Lashly, Caruthers, Baer & Hamel, St. Louis, Mo., for Reinholdt & Gardner, Cady, Connolly, Davis, Eckman, Eddy, Erker, Gardner, Hagensieker, Jones, Johnson, Langenberg, McLaughlin, McMillan, Riordan, Robingon, Shand, Simpson, Upthegrove & Welsh & Oliver Clark.
W. Stanley Walch, Robert Brownlee, Thompson & Mitchell, St. Louis, Mo., for Public Water, Leonard, Davis, Jobs, Abney, Fleischer, Batts.
G. William Weier, Weier & Sherby, Crystal City, Mo., for Public Water, Batts, Abney, Jobs, Davis, Fleischer & Linkul.
David J. Hase, Foley & Lardner, Milwaukee, Wis., for Oliver P. Clark, III.
Terrance J. Good, James E. McDaniel, Lashly, Caruthers, Baer & Hamel, St. Louis, Mo., for Rothaus, Bartels, Earley & Co., Rothaus, Bartels, Earley, Watkins, Janssen & Begley.
Rodger J. Walsh, Kansas City, Mo., for Grandview Bank & Trust.

MEMORANDUM OPINION
HARPER, District Judge.
This matter is before the Court on six motions for summary judgment. One of the motions for summary judgment was filed by the plaintiff-intervenor, Traders Bank of Kansas City (hereinafter referred to as Traders), against defendants, Stinson & Mag, Public Water Supply District No. 7 of Jefferson County, Missouri, Ivie E. Batts, A.R. Jobs, Walter Fleischer, John Linkul, Marvin Leonard, Glen F. Davis, Gregory O'Shea, and Rothaus, Bartels & Earley & Company.
The other five motions for summary judgment were filed by the following defendants against the plaintiff and plaintiff-intervenor:
Reinholdt & Gardner,
Stinson & Mag in regard to the claims asserted by the plaintiff and the plaintiff-intervenor, as well as the crossclaims asserted by defendant, Public Water Supply District No. 7,
Rothaus, Bartels, Earley & Company,
Public Water Supply District No. 7 of Jefferson County, Missouri, and
Gregory O'Shea.[*]
The complaint of the plaintiff, Shelter Mutual Insurance Company, formerly MFA Mutual Insurance Company (hereinafter referred to as Shelter), was filed October 28, 1981, and is directed against all parties who had any connection with the 1972 municipal bonds issued by the Public Water Supply District No. 7 of Jefferson County, Missouri (hereinafter referred to as PWSD7), in an attempt by Shelter to recover losses as a result of holding 1972 bonds in the principal face amount of $675,000.00, as well as its holding of 1966 bonds (purchased in 1978) in the principal face amount of $100,000.00.
Count I of the complaint alleges that the defendants[1] violated Section 10(b) of the Securities Exchange Act of 1934 and Rule *312 10b-5 in regard to both the 1972 and 1966 bonds, and asks for damages in excess of $725,000.00 (an amount prayed for in the other counts).
Count II is directed against Reinholdt & Gardner and alleges violations of Sections 10(b), 15(c)(1) and 15(c)(2) of the 1934 Securities Act and Rules 10b-5 and 15c-1-2.
Count III is directed against those individual defendants connected with PWSD7 and also alleges violations of Section 10(b) of the Securities Exchange Act of 1934 (hereinafter referred to as the Act), and Rule 10b-5.
Count IV is against defendants, Reinholdt & Gardner, Rothaus, Bartels & Earley & Co., Stinson & Mag, and O'Shea, and also concerns violations of Section 10(b) of the Act and Rule 10b-5.
Count V is against the same defendants as in Count IV, and alleges aiding and abetting of security law violations of Section 10(b) and Rule 10b-5.
Count VI is against PWSD7, Reinholdt & Gardner, Rothhaus, Bartels & Earley & Co., O'Shea and Stinson & Mag, and alleges common law fraud.
Count VII is against the same defendants as in Count VI, and alleges common law conspiracy.
Count VIII, the last count, alleges common law negligence against Reinholdt & Gardner, Rothaus, Bartels & Earley & Co., Stinson & Mag, and O'Shea.
The plaintiff-intervenor's complaint, filed April 5, 1982, alleged violations of the Federal Securities law against PWSD7, O'Shea, Rothaus, Bartels & Earley & Co. in Count II, and against Stinson & Mag in Count III. Both concerned violations of Section 10(b) of the Act and of Rule 10b-5. Count V is against PWSD7, O'Shea, Rothaus, Bartels & Earley & Company for common law fraud and conspiracy. Count VI is against Stinson & Mag for common law fraud and negligence. Count I is against Perry, Adams and Lewis, and related entities, for violations of the Federal Securities law, and Count IV is an action for common law fraud and conspiracy against the same defendants as in Count I.)
The threshold issue to be resolved in regard to the five motions for summary judgment by the named defendants in the motions against Shelter and Traders is: Does this Court have subject matter jurisdiction of all claims in this action? If this Court lacks subject matter jurisdiction in regard to the Federal securities claims, then it would have to reconsider its jurisdiction over the pendent state claims. (Counts VI, VII and VIII as to Shelter, and Counts V and VI as to Traders). See United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). One reason this Court might lack subject matter jurisdiction is if the applicable statute of limitations for the type of Federal securities claims involved has run, then the Federal securities law claims of Shelter and Traders would be time-barred, leaving only their pendent claims under state law to be resolved.
In Morris v. Stifel Nicolaus & Co., 600 F.2d 139 (8th Cir.1979), the Eighth Circuit held that when no Federal limitation period is provided, that the forum's state statute of limitations which would "best effectuate the Federal policy at issue," as set out in Vanderboom v. Sexton, 422 F.2d 1233, 1237 (8th Cir.1970), and in a Rule 10b-5 claim filed in Missouri, would be the two-year period of limitation for actions brought under the Missouri blue sky statute.[2] The Court in Morris noted that those provisions of the Federal securities acts which do contain specific limitation periods for private actions generally are one year to a maximum of three years after actionable facts occurred, which indicates a Congressional preference for short limitation periods for securities law actions. 600 F.2d at 145-146.
Vanderboom, supra, at 1240, further clarifies the rule on statute of limitations for Rule 10b-5 actions in Federal Courts, stating:
"[W]here the cause of action is federal in origin but a forum state's statute of *313 limitations is being used * * * the federal law applies in regard to determining the date on which a statute of limitations begins to run. Federal law, since the case of Bailey v. Glover, 88 U.S. 342, 21 Wall. 342, 22 L.Ed. 635 (1875), has been that in cases involving elements of fraud neither a statute of limitations nor the equitable doctrine of laches can be said to begin to run until the fraud is or should have been discovered."
As the Morris case noted, at 140: "[A] motion for summary judgment is an appropriate method for raising a statute of limitations defense. Kern v. Tri-State Ins. Co., 386 F.2d 754, 756-757 (8th Cir.1968)." Though a summary judgment is a "drastic remedy," Koke v. Stifel, Nicholaus & Co., Inc., 620 F.2d 1340, 1343 (8th Cir.1980), if the determination is made that the statute of limitations is an absolute bar to the 10b-5 claims of Shelter and Traders and thus judgment should be in defendants' favor, then to hold otherwise would be contrary to the purpose of summary judgment. In Klinge v. Lutheran Charities Ass'n of St. Louis, 523 F.2d 56, 61 (8th Cir.), said:
"* * * [T]he district court [383 F.Supp. 287, E.D.Mo.] also recognized, and quite properly, that `it must be kept in mind that the purpose of [28 USC] Rule 56 is to avoid the expenditure of judicial time and to avoid trials when the facts are not in dispute insofar as they are material to the lawsuit.'"
Since the defendants have raised the statute of limitations defense, the burden then shifts to the plaintiff Shelter and the plaintiff-intervenor Traders to assert that their claim is not time-barred because the Federal doctrine of equitable tolling applies. Long v. Abbott Mortgage Corp., 459 F.Supp. 108 (D.Conn.1978). The Court in Long, at 113, said:
"The essence of equitable tolling is that * * * [t]he statute only begins to run `when the plaintiff either acquires actual knowledge of the facts * * * or should have acquired such knowledge through the exercise of reasonable diligence after being apprised of sufficient facts to put him on notice." [Citing City of Detroit v. Grinnell Corp., 495 F.2d 448, 461 (2d Cir. 1974).] (Emphasis added.)
The facts, which are not really in dispute, recite a tale of securities fraud "masterminded"[3] by a Kansas City underwriting firm known as Perry, Adams & Lewis, Inc. (or P.A.L., as they have come to be called in the pleadings.) But since P.A.L. is unavailable because of a bankruptcy order, plaintiff and plaintiff-intervenor have now focused on the culpability of the non-bankrupt defendants  the bond counsel (Stinson & Mag), the broker-dealer (Reinholdt & Gardner),[4] the issuer (Public Water Supply District No. 7 of Jefferson County and the officers and directors of Public Water Supply District No. 7), the accountant (Rothaus and Bartels), and the issuer's counsel (Gregory O'Shea) in these motions.
A summary of the facts based on the depositions, exhibits and pleadings is as follows:
Public Water Supply District No. 7 was incorporated in Jefferson County in 1965. It issued bonds in 1966 and 1967, following approval of the bond issues by the voters, with the assistance of P.A.L., Stinson & Mag and O'Shea. There is no dispute that these were properly issued bonds[5] and PWSD7 continues to pay the interest on them as they become due.
The origin of this lawsuit was when the Board of Directors of PWSD7 authorized the issuance of $1,900,000.00 in bonds on *314 August 15, 1972 (hereinafter referred to as the PWSD7 1972 bonds). Stinson & Mag, the bond counsel, was contacted by O'Shea, PWSD7's lawyer, for assistance with the issuing of these bonds. Jerry Powell, a partner of Stinson & Mag, prepared and assembled the necessary documents for issuing the bonds and sent them to O'Shea on September 22, 1972, with explicit instructions (See Powell Exhibit No. 7) as to how the documents should be completed.[6]
At approximately the same time that the bonds were being prepared to be issued, Shelter was in the process of purchasing $675,000.00 of these PWSD7 1972 bonds. Oliver Clark, then a broker with Reinholdt & Gardner, called Paul Keithley, who was then Secretary-Treasurer of Shelter[7] to recommend that he purchase the PWSD7 1972 bonds. Shelter's investment portfolio at the time of the purchase of the 1972 bonds was valued at from one hundred seventy-five to two hundred million dollars. (Keithley Depo p. 44). Shelter's investment committee[8] was not required to be involved in the decision-making process with regard to nearly all the bonds purchased, because ninety-five percent of Shelter's bond purchases were "A" rated or better. (Keithley Depo p. 14). However, to purchase these unrated PWSD7 1972 bonds, it was necessary for Keithley to take his recommendation to Shelter's investment committee. Implicit in this requirement for an investment committee decision for unrated bonds is the notion that unrated bonds were riskier, and thus, before purchase, there should have been more consideration of their potential worth, as well as an investigation of their present true worth. However, Keithley admitted that when he recommended the purchase of PWSD7 1972 bonds, which the investment committee readily accepted, he relied solely on his telephone conversation with his broker, Clark, on September 6, 1972.[9] No further investigation was made, and although Keithley told Clark he was familiar with the Jefferson County area because Shelter had agents in that area that he (Keithley) dealt with (Clark Depo p. 29), no contact was made to any of those agents. The Court notes that the decision to purchase the bonds was made by the investment committee on September 7, 1972  weeks before "the closing," as well as before Stinson & Mag had sent its "to be completed" bond documents and its undated bond opinion to O'Shea (see n. 6).
Why was Keithley so eager to purchase these 1972 unrated bonds, though, as he now concedes, he knew nothing about PWSD7 or its bonds?[10] The reason for Keithley's eagerness was simply that in 1972, Shelter, in an attempt to avoid taxes, was transferring a large portion of its investment portfolio into tax free municipal bonds. This tax avoidance was done to such an extent that Shelter became the leading municipal bond purchaser in the state. In this case, the 1972 bonds were to pay interest at 6% and produce a yield of 6.25%. With the prime then at 6%, the tax free yield offered was perhaps too attractive to investigate further. Keithley, however, claims that he was persuaded to buy because Clark, his broker, told him that the bonds would be redeemed at 104, so that within a short period of time Shelter would *315 make forty to fifty thousand dollars on the transaction. Yet could Clark really promise, and Keithley rely upon, a call that was dependent on the results of an election not yet held? ("If this election carries and they buy out the system, our bonds would be called on thirty days' notice." [Keithley Exhibit # 3, Minutes of the meeting of the Shelter investment committee.] Emphasis added.)
Following the Shelter investment committee decision of September 7, 1972, a purchase order was given to Reinholdt & Gardner on September 28, the day before the PWSD7 "closing," on the basis of "when, as and if issued" (Keithley Exhibit No. 28). On October 10, 1972, Shelter was billed for the bonds it purchased (Keithley Exhibit No. 29). Thereafter, on October 16, 1972, Shelter paid Reinholdt & Gardner $658,315.40 for the $675,000.00 principal amount of the bonds (Keithley Exhibit No. 7).
What occurred at "the closing" was that Norman Lewis of P.A.L. told PWSD7 and O'Shea that they would hold both the PWSD7 1972 bonds and a check for the proceeds in escrow until the funds were needed. Thus, P.A.L. obtained possession of the PWSD7 1972 bonds at the time they were issued by having a check from P.A.L. forwarded to PWSD7, where it was endorsed, and then having this check returned to P.A.L. to be placed in escrow (O'Shea Depo pp. 88-91). Subsequently, the check in the not quite escrow account was replaced by a note payable to PWSD7 from J.V. & M. Construction (an entity controlled by P.A.L.) in the amount of $1,900,000.00 with an interest rate of 6% (O'Shea Depo pp. 198-201).
After the execution of this note to PWSD7, the assets of J.V. & M. Construction were sold "piecemeal" and at present the note is worthless as a result of those sales and the bankruptcy of P.A.L. (For further description of J.V. & M.'s transactions, see Public Service Commission Order, Powell Exhibit No. 13, pp 2-3.)
In summary, at "the closing," though cash or its equivalent was not received by PWSD7, P.A.L. received possession of the 1972 bonds, which P.A.L. offered for sale to the securities market in Kansas City. Clark of Reinholdt & Gardner purchased the 1972 bonds from P.A.L. and resold them  similar to three other transactions, all within six months (between April and September, 1972), wherein Clark had sold a total of four substantial blocks of unrated bonds to Shelter that had been underwritten by P.A.L.
One of these blocks of unrated bonds was the Kanopolis, Kansas bonds (See Keithley Depo pp. 46-53, 59-60, 64). Keithley bought those unrated bonds in April of 1972 (for Shelter's portfolio) on the strength of Clark's statement that these Kanopolis bonds were guaranteed by Northern Natural Gas. In 1973, a Kansas judge directed that Shelter be informed (as holders of these bonds) that there was litigation pending (P.A.L. was one of the defendants) regarding the control of Kanapolis Gas. As a result of that information, Keithley then discovered that the Kanpolis bonds were not in fact guaranteed, so he demanded that Clark take the bonds back because of that misrepresentation. Clark had P.A.L., the underwriter for those bonds, repurchase the Kanpolis bonds.
The other two blocks of unrated bonds that were purchased at around the same time in 1972 as the PWSD7 1972 bonds, were the Keystone and McIntosh bonds. When the interest payments on these bonds ceased in 1976, Keithley contacted the bank that was the paying agent, Columbia Union National Bank, to discover why the interest payment due in February, 1976, had still not been paid by May, 1976 (Keithley Exhibit No. 6). In July of 1976, the Shelter house counsel wrote the General Counsel for Reinholdt & Gardner regarding the McIntosh and Keystone bonds. In his letter, the Shelter house counsel emphasizes the factual similarities between three of the blocks of unrated bonds purchased been April and September, 1972, including the statement that "Perry, Adams and Lewis was also involved." (Keithley Exhibit No. 20, p. 2 Shelter-Reinholdt & Gardner letter). Shelter filed suit in August of 1976 in the matter of the McIntosh and Keystone *316 bonds, naming as defendants, among others, Perry, Adams and Lewis (as individuals and as a company), Oliver Clark, and Reinholdt & Gardner. In the complaint, Shelter alleges that Section 10(b) and Rule 10b-5 security fraud violations were committed by Clark, Reinholdt & Gardner and P.A.L. Specifically, it charges that Clark, to induce purchase of the McIntosh and Keystone bonds, represented that Cities Service Gas Company guaranteed the Keystone bonds, and that the McIntosh bonds were guaranteed by Oklahoma Natural Gas Company  which was in fact not true. (See complaint, Count I(G), Keithley Exhibit No. 21.) Also, the complaint alleges "that the proceeds of the bond issues were to be paid into the general corporate accounts of P.A.L. and its principals, officers and directors, for their own exclusive use and benefit" (see complaint, p. 8).
Keithley was asked if he had considered that since he had claims regarding three of the four blocks of unrated bonds, that he should have probably also inquired about the worth of the PWSD7 1972 bonds, since it involved the same broker, brokerage and underwriter as the other three blocks of bonds, as well as that all had been purchased near in time to when the PWSD7 1972 bonds were bought (Keithley Depo p. 77). Keithley's response was that since "they [the PWSD7 1972 bonds) were paying" interest,[**] "they got buried in the portfolio" (Keithley Depo p. 77). When it was pointed out that the other three blocks of unrated bonds "were [also] paying" interest up until around the time claims were filed against them in 1973 and in 1976, respectively, Keithley then conceded that perhaps he "should have" looked into the PWSD7 1972 bonds (Keithley Depo p. 78).
One of the grounds for summary judgment asserted by the defendants is that the two-year statute of limitations applicable to Section 10(b) claims bars recovery for the plaintiff Shelter. Vanderboom, supra. After the defendants have raised this statute of limitations issue, the plaintiff has countered that Shelter's claim is not barred because the doctrine of equitable tolling applies; in other words, that the limitation period only begins to run from the date of discovery of the fraud or at the time when notice of facts would have led to actual discovery of the fraud, with the exercise of due diligence, Koke, supra.
Shelter contends that the plaintiff still has the right to recovery because they did not or could not have discovered the fraud until 1980. The plaintiff frames this inquiry to determine if due diligence was exercised, given the uncontroverted facts and circumstances: "Should Shelter have known * * * (before 1979) what even those most intimately involved in this debacle deny knowing until 1980?" (Shelter's memorandum in opposition to motion of Reinholdt & Gardner for summary judgment, p. 4.)
But to state the issue that way is to blatantly ignore the law in this Circuit, that the statute of limitation begins to run from the time the plaintiff discovered or should have discovered the fraud. Koke, supra. What the defendant knew or should have known is not germane to our inquiry. As the Eighth Circuit said in Koke, supra, at 1343: "It comes down to this: Should a person in the position of Margaret Koke [the plaintiff], upon reasonable inquiry, have discovered the facts constituting the alleged fraud on or before March 30, 1975?" The plaintiff there filed suit on March 30, 1977.
The District Court in Koke, 480 F.Supp. 747 (E.D.Mo.) held that recovery on both counts (one count consisting of Section 10(b), Rule 10b-5 and Section 17 Federal security law violations, the other count being common law fraud) were barred by reason of the two-year statute of limitations. The Eighth Circuit upheld the grant of summary judgment as to the federal *317 security law fraud in Count I.[11] What makes their rule for determining when the limitation period begins to run (as stated above) so significant is the factual context in which the decision was made. Margaret Koke was not a sophisticated investor by anyone's definition. She was a "novice investor," investing her personal savings "accumulated * * * through thrift" from her job as a bookkeeper for a small South St. Louis firm, as well as her mother's savings, "who [also] had no experience handling money." Koke, supra 1341. That the plaintiff in Koke, a novice investor, should be required to exercise reasonable care and diligence, and when made aware of certain facts be required to initiate an inquiry, means that it is at least as equitable that Shelter, whose portfolio was managed by Keithley, assisted by an investment committee, should likewise be held to exercise reasonable care and diligence for a reasonable person in its position. "Investors are not free to ignore warning signals * * * [because] `the statutory period * * * [does] not await appellant's leisurely discovery of the full details of the alleged scheme.' Klein v. Bower, 421 F.2d 338, 343 (2nd Cir.1970)." Koke, supra, at 1343.
Applying the rule in Koke to this case at bar requires that the Court must determine: Did Shelter have notice of sufficient facts that it should have discovered the fraud before 1979 (it filed this suit in the fall of 1981)? Looking back to Shelter's knowledge in the early to mid-seventies, there were several facts, either alone, or in conjunction with other known facts, that should have caused Shelter to initiate an inquiry regarding fraud involving the PWSD7 1972 bonds. For Shelter to purchase these four blocks of unrated bonds (including the PWSD7 1972 bonds), was rarely ever done, according to Shelter's house counsel, who made this statement in a letter to Reinholdt & Gardner's general counsel: "As a matter of Company policy, we purchase only Moody `A' or better rated bonds which are guaranteed by well known and reputable companies." (Keithley Exhibit 20, Letter from Shelter's house counsel to Reinholdt & Gardner's general counsel regarding McIntosh and Keystone bonds dated July 9, 1976). So if the Court is to rely on Shelter's attorney's statement of company policy as true, it means that if the purchase of the Kanopolis, McIntosh and Keystone bonds was a rare exception to company policy, because though unrated, at least they were [supposed to be] guaranteed by well known companies; then the purchase of the PWSD7 1972 bonds was directly contrary to company policy, because those bonds were never rated, nor claimed to be guaranteed by a reputable company. Keithley, the purchaser of these bonds for Shelter, admitted that he knew nothing about the worth of the PWSD7 bonds, but he bought these unrated, unguaranteed bonds anyway. In his deposition, Keithley was asked, and made the following answer (Keithley Depo p. 34):
"Q Did you specifically discuss with Mr. Clark [the broker] whether these bonds were safe or worthwhile investments?
"A Well, I don't remember that, but my dealings with Ollie Clark and the rest of the brokers was such that that was not necessary."
In fact, the only representation that Clark made regarding the PWSD7 1972 bonds that Shelter claims it relied upon, but which later turned out not to be true, was that these bonds would be called at $104 if and when Flat River passed a bond issue. Keithley made a few inquiries regarding the call of these bonds during the period after the purchase in late 1972, until 1974, when Clark was fired by Reinholdt & Gardner. The firing of Clark, considering the enormous reliance that Keithley placed on his brokers (Keithley Depo p. 34 quoted above), would have caused a more reasonable investor to perhaps question that reliance, especially for those exceptional investments that were neither rated nor guaranteed by reputable firms. Yet *318 though the fact that the unrated Kanopolis bonds were discovered not to be guaranteed by Northern Natural Gas, as Clark had stated, nor that the PWSD7 1972 bonds had yet to be called, none of these facts seemed to suffice as a warning to Shelter by 1974. Instead, Keithley continued to use Reinholdt & Gardner as his broker after Clark's dismissal, and never made any further inquiries regarding the call of the PWSD7 bonds.
Although Shelter's counsel noted that "the circumstances surrounding these two (McIntosh and Keystone bonds) issues are strikingly similar to * * * [the fraud regarding the] Kanopolis [bonds] * * *" (Keithley Exhibit No. 20, p. 2), no one at Shelter reviewed the purchase of the fourth block of unrated bonds that logic would have connected with the three blocks of bonds mentioned above. Further, though Shelter found sufficient reason to file suit alleging security fraud against P.A.L. (as underwriter) and Reinholdt & Gardner (as broker) for three of the blocks of unrated bonds purchased in 1972, as well as to cease doing business with Reinholdt & Gardner after the second suit was filed in 1976, none of these occurrences, nor other facts already mentioned, did Shelter regard as warning signals for the worth of the PWSD7 1972 bonds. In sum, by 1976 Shelter knew that Clark, on whose advice it relied upon, had been fired, that PWSD7 1972 bonds had never been called, and most importantly, Shelter knew that it had alleged securities fraud with regard to the Keystone, McIntosh and Kanopolis bonds, whose similarities with the PWSD7 1972 bonds should have been noted. Shelter, thus, had notice of sufficient facts that a reasonable person, in its position, with the exercise of due diligence, would have discovered the fraud before 1979 (Shelter filed this suit in October of 1981).
Shelter is thus barred by the statute of limitations from recovery on Counts I, II, III, IV and V of its complaint as to the 1972 bonds in the amount of $675,000.00 as to the defendants who filed the five summary judgments.
Turning now to the four summary judgments filed by the defendants, Stinson & Mag, Rothaus, Bartels, Earley & Co., PWSD7 and its directors, and O'Shea, against Traders, the issue has also been raised that the statute of limitations has run, and that, therefore, the Court lacks subject matter jurisdiction for Traders' federal securities law claim. Traders contends that the factual record of the relationship between Traders and P.A.L. reveals only "a normal banking relationship"[12] until the defaults and the deficiencies occurred, whereupon Traders reacted quickly and took appropriate action well before the two-year statute of limitation had run. To determine if Traders is barred from recovery, for reasons already discussed, the Court will apply the rule from Koke,[13] supra: Should a reasonable investor in the position of the plaintiff, with reasonable diligence, have discovered the facts constituting the alleged fraud before 1979, to the factual situation now before the Court?
Traders in asking why should a stranger to the events be expected to make an investigation (when other defendants made no inquiry, is making a flawed argument, because it disregards the law in the Eighth Circuit that focuses on what knowledge the plaintiff had, or should have had, with reasonable diligence, when deciding if the statute of limitations has run for a Rule 10b-5 action.
How Traders between the months of October, 1978 and November, 1979, came to have pledged with it the PWSD7 1972 bonds as a part of the collateral for a loan, requires a review of the factual situation, since the facts are "the key consideration in determining when the statute of limitations should have run." Prior to October, 1978, Perry, Adams and Lewis (P.A.L.) had substantial *319 loans with the First National Bank in Kansas City, but in June of 1978, the loan officer at the First National Bank responsible for the P.A.L. account decided to cancel their line of credit. First National took this drastic action because it felt unsure about the value of the collateral pledged (as security for loans), which included the PWSD7 1972 bonds in question and other municipal bonds that had been in P.A.L.'s inventory for an unusually long period of time. That First National had considered this account as one that it had to watch closely and check frequently suggests that the cancelation of P.A.L.'s credit line was not a precipitive action.
When Traders took over P.A.L.'s line of credit, Traders did not check with First National as to its experience with the P.A.L. account and the circumstances surrounding P.A.L.'s leaving First National (Stallard Depo p. 209), although it is not an uncommon practice for a bank to check with a customer's former bank when it is approached for a substantial loan by its new customer. Traders knew at the time of its loan that the collateral pledged by P.A.L. was the very same collateral that had been pledged to First National, but what Traders did not know (because it did not check with P.A.L.'s former bank) was that First National had been concerned about this collateral.
Glenn Stallard was the loan officer at Traders responsible for P.A.L.'s account from October, 1978 until July, 1980.[14] When asked about what investigation was done to determine P.A.L.'s credit worthiness, Stallard testified in his deposition (p. 61):
"I don't believe that we (Traders) did very much. Because * * * of the reputation of the firm and the fact that we did have liquid collateral.
"I think another facet of that was that they (P.A.L.) had moved from First National, which historically, is a fairly conservative bank." (Emphasis added.)
Stallard went on to explain that the "conservative" nature of First National gave "credibility to the collateral." (Depo p. 61)
Jack Perry's "unbelievable credibility" (Stallard Depo pp. 173-174) with Traders is apparent from the disclosure that the bank accepted Perry's word as to the value of the bonds listed as collateral without making any independent inquiry as to their worth (Stallard Depo p. 90).
Traders was well aware that P.A.L. was an underwriter of municipal bonds, and yet it accepted as collateral bonds which, if valued as highly as misrepresented, would have probably not still been in P.A.L.'s inventory years after they were issued (Stallard Depo pp. 83-85). One of the "warning signals" that Traders ignored, and that undoubtedly would have led them to question the value of other bonds (including the PWSD7 1972 bonds) pledged in 1978, was the Eufala bonds.[15] Had anyone at Traders checked these Eufala bonds that were part of the collateral P.A.L. pledged, they would have found years of interest coupons still attached. As Stallard noted, when the collateral file for P.A.L. was finally checked (which did not occur until April of 1980), the four years of attached coupons "raised suspicions to its value" (the Eufala bonds). Shortly thereafter, Traders discovered that the Eufala bonds, when pledged in 1978, had at that point been in default for over two years;[16] yet Traders had blindly accepted Jack Perry's representation that both the Eufala and PWSD7 1972 bonds were worth at least 95% of their face *320 amount in his evaluation of the worth of the collateral pledged. (Stallard Depo p. 144.)
Why would Traders not examine or investigate the worth of the collateral pledged by P.A.L. for loans? The friendship between Jack Perry and Charles Oliver, the president of Traders, as well as Jack Perry's frequent contact with George Lehr, the chief executive officer of the bank, has been suggested; but there was also a more tangible motivation that Stallard noted was an "important factor" in approval of P.A. L.'s loans  P.A.L.'s reputation. (Stallard Depo, Vol. II, p. 63) P.A.L. "enjoyed an excellent reputation with all the state and counties in Missouri." (Stallard Depo p. 86) As a result of this reputation, many of the counties or other issuing entities would, after P.A.L. underwrote the bond issue, place their funds in Traders. Thus, P.A.L. was thought to be a very desirable account, because "it generated funds" by bringing in other substantial accounts into the bank (Stallard Depo p. 87). The significance of the personal relationships between P.A.L. and the bank diminishes when compared to the pecuniary motivation Traders had for not checking the value of the collateral pledged: Traders was a direct beneficiary of P.A.L.'s excellent reputation. Traders had, in fact, little to gain by investigating P.A.L. and uncovering any facts that would tarnish a reputation that so far had bestowed customers and their funds on Traders.
Hence, it is not surprising that Traders exerted no effort to investigate the value of the bonds pledged until about a year after extending credit, and even then it was very half-hearted and ineffectual. Stallard requested a value on the bonds pledged by P.A.L. (to secure over $1,800,000.00 in loans) from his friend, Jack Buckner, with Zahner Brothers, as well as from Stern Brothers, another Kansas City broker. Buckner, for his appraisal, asked Jack Perry what some of the bonds were worth (including the PWSD7 bonds and Eufala bonds). Buckner adopted Perry's valuation in the appraisal Buckner did for Stallard.[17] Although Stallard knew that Buckner's appraisal, insofar as the Eufala and PWSD7 1972 bonds, was merely a reiteration of Perry's valuation, Traders did not pursue the offer of Stern Brothers to do an independent appraisal for a cost of $5,000.00. No other investigation was initiated regarding the value of the bonds held as collateral until the spring of 1980, when the financial difficulties of P.A.L. were quite obvious.
Traders, if it had exercised due diligence, would have asked some of the following questions much earlier than it did: Why did P.A.L. seek Traders for a loan? Why did P.A.L. leave First National? Why did First National regard the P.A.L. account as one that had to be watched closely? Why did First National feel concerned about the collateral pledged? And, finally, Traders should ask itself why it never got an independent appraisal of the collateral that was securing nearly two million dollars in loans for P.A.L. Had Traders exercised sufficient diligence required of a sophisticated investor, Traders should have discovered that misrepresentations that Perry made concerning the pledged PWSD7 1972 bonds in 1978. Instead, Traders relied totally on its customer's word as to the securities it held without making any inquiries of its own to corroborate Perry's claims. If the Court in Koke, supra, required that the novice investor plaintiff do more than simply rely on the word of her broker (he misrepresented the value of her account), then this Court will demand no less from a sophisticated investor with the resources of information unavailable to a plaintiff investor as in Koke, supra, at 1344.
Traders had notice of sufficient facts, that as a sophisticated investor, it should have with due diligence, discovered the fraud before 1980 (Traders filed its complaint April 5, 1982). Therefore, Traders is thus barred by the statute of limitations from recovery on Counts II and III of its complaint as to the defendants who filed the four summary judgments.
*321 Under another equally viable theory that applies the relevant statute of limitations to the claims in this action, and the result, is also that recovery would be barred for the plaintiff and the plaintiff-intervenor.
In Morris, supra, the only issue considered by the Eighth Circuit was whether the district court had been correct in its application of the two-year Missouri blue sky limitations period, § 409.411(e), to the federal securities claim. The Eighth Circuit stressed in its analysis the similarity between Rule 10b-5 actions and § 409.411 actions, and said, at 143:
"Both the underlying federal and state statutes * * * deal expressly with the sale of securities; and both prescribe misrepresentations or omissions to state material facts in connection therewith. Moreover, the Missouri blue sky statute evinces the same fundamental purpose as the federal securities acts * * *." (Citation omitted.)
In his ruling on a motion for summary judgment in a federal securities fraud action, Judge Regan of this court, in Buder v. Merrill, Lynch, Pierce, Fenner and Smith, 486 F.Supp. 56, 58 (E.D.Mo.1980), noted that the relevant statute of limitations for Rule 10b-5 claims, § 409.411(e), provides "in unambiguous language and without exception that `[n]o person may sue under this section more than two years after the contract of sale.' * * * [In other words], there is no tolling provision applicable to claims under the Missouri blue sky law."
According to Missouri law cited in that opinion, where there is a special statute of limitations, such as § 409.411(e), which applies only to a certain type of actions, "`[T]he running thereof cannot be tolled because of fraud, concealment or any other reason not provided in the statute itself.'" [Citing State ex rel. Bier v. Bigger, 352 Mo. 502, 178 S.W.2d 347, 350 (en banc 1944).] (Emphasis added.) Buder, supra, at 59.
Hence, the theory is that if one borrows the Missouri statute of limitations (for application to Rule 10b-5 actions), and that limitation statute contains no tolling provision, then this Court should "`engraft * * * [other exceptions] upon it.' (Citation omitted.)" Buder, supra, at 59.
Thus, applying this theory, the limitations period would have run by 1979  two years after Shelter purchased those PWSD7 1972 bonds, as well as long before the PWSD7 1972 bonds were pledged to Traders. Prior to 1978 and 1979, when these bonds were pledged to Traders, the PWSD7 1972 bonds were pledged to First National as collateral until 1978; however, the statute of limitations had long since run before the bonds were pledged to Traders, as the theory set out in the discussion above explains.
Like the Court in Morris, supra, at 145, this Court is "also unpersuaded that longer limitations periods best serve federal securities policy as a general premise." Therefore, to apply any doctrine that would allow a short limitation period to be tolled for a possibly interminable length of time would certainly not be in keeping with the obvious Congressional preference of short limitation periods as evidenced by the limitation periods found in the federal securities acts. An example that typifies their preference in the limitation period for a § 15(c)(1) and (2)[18] of the 1934 Act, § 29(b) of that Act, which requires that the claim must be brought within one year after the discovery of the alleged violation, but not later than three years after the violation occurred. Hence, "the Missouri blue sky law two-year period [would] better effectuate federal securities policy," if applied without exceptions or doctrines that function to toll for an indefinable time period. Morris, supra, at 146.
In Miltsky v. Merrill, Lynch, Pierce, Fenner and Smith, 540 F.Supp. 783, 788 (N.D. Ohio 1980), that court, to justify its harsh application of the statute of limitations to effectively bar the plaintiff's Rule 10b-5 claims, citing United States v. Kubrick, 444 U.S. 111, 125, 100 S.Ct. 352, 361, 62 L.Ed. 259 (1979), said:

*322 "`It goes without saying that statute of limitations often make it impossible to enforce what were otherwise perfectly valid claims. But that is their very purpose. * * * We should give them effect in accordance with what we can ascertain the legislative intent to have been.'"
Since the Congressional preference for short limitation periods (without exceptions) is quite evident in the federal securities acts, then the unavoidable effect for the federal securities claims of these plaintiffs is that they are far too "stale" for this Court to retain.
Further, defendants have raised the question of whether Traders should be able to invoke jurisdiction of this Court because of the threshold requirement of being a purchaser for a Rule 10b-5 action. This question arises because of the issue of whether a pledge of securities as collateral constitutes a sale of a security, for such an issue has never been considered by the Eighth Circuit, nor has the issue been uniformly resolved by the other Circuits that have ruled on it. This Court, being a federal court of limited jurisdiction, must always address the question of jurisdiction.
Traders urges in its reply that "the rule established by the Supreme Court in Ruben (sic) v. United States be adopted." Rubin v. United States, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981). However, there are factors that distinguish Rubin from the instant case which argue against any application of its holding here. In Rubin, the defendant was appealing his criminal conviction[19] of conspiring to violate various federal anti-fraud statutes, among them § 17(a) of the Securities Act of 1933 (hereinafter referred to as the 1933 Act), which differs significantly from this action for damages for violations of Section 10(b) of the 1934 Act, which currently focuses on those defendants who were not the criminal mastermind behind this security fraud. Certiorari was specifically granted in Rubin to decide whether a pledge of stock to a bank as collateral for a loan is an "offer or sale" of a security for purposes of Section 17(a) of the 1933 Act,[20] 449 U.S., at 425, 101 S.Ct. at 699, not on the basis of whether a pledge of securities is a "sale" for purposes of Section 10(b) of the 1934 Act.
The Court in Rubin stated that "it is not essential under the terms of the 1933 Act that full title pass to a transferee for the transaction to be an `offer' or `sale'" (emphasis added), 449 U.S. at 430, 101 S.Ct. at 701, thus implying that partial or conditional title is sufficient for a pledge to be an "offer" or "sale" under Section 17(a). But those PWSD7 1972 bonds which were pledged to Traders as collateral for P.A.L.'s loan were actually supposed to remain in escrow, according to the understanding that PWSD7 had with P.A.L. Hence, it is not clear from Rubin whether the Supreme Court would hold that the pledge of the PWSD7 1972 bonds was a sale, since in the instant case the pledgor, P.A.L., had no title in those pledged securities, and thus could transfer no rights of ownership to Traders, nor did Rubin involve a pledge of securities in connection with Section 10(b) violations.
A decision that came after Rubin, Marine Bank v. Weaver, 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), held that neither a certificate of deposit (C.D.) that was pledged to the Marine Bank, nor the agreement that the company owner made with pledgors in consideration for their pledge guaranteeing the loan for the company, were securities under Section 10(b) of the 1934 Act. In Marine Bank, the Court noted that "the Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud." 102 S.Ct. at *323 1223. It further justified its limitation of Section 10(b) coverage by reasoning that the pledgors of the C.D. were "abundantly protected under federal banking law." 102 S.Ct. at 1225. Hence, the Court in Marine Bank came to agree with the District Court that "if a wrong occurred, it did not occur `in connection with the purchase or sale of any security.' (§ 10(b) of the 1934 Act)." 102 S.Ct. at 1222.
The Circuit Courts, as noted before, are in disagreement on the threshold jurisdictional issue of whether a pledge is a sale under Section 10(b) of the 1934 Act and its Rule 10b-5. The Second and Sixth Circuits have ruled that a pledge is a sale,[21] while the Fifth and Seventh Circuits have ruled that a pledge is not a sale.[22] The Tenth Circuit has also ruled on this issue, but the basis of its ruling is unclear.[23]
The Fifth Circuit in National Bank of Commerce of Dallas v. All American Assurance Company, 583 F.2d 1295 (5th Cir.1978), discusses those cases in which various Circuits have ruled that a pledge is a sale and distinguishes most of them. However, that court did find that, in contrast, both United States v. Gentile, 530 F.2d 461 (2nd Cir. 1976) and Mallis v. FDIC, 568 F.2d 824 (2nd Cir.1977), were "hardly distinguishable from the facts in the instant case." 583 F.2d at 1299.[24] Thus, the Fifth Circuit felt compelled to examine the reasoning of Gentile and Mallis, and it found, 583 F.2d at 1299, 1300:
"[Both] decisions were grounded upon the rationale that the pledgee assumes a very real investment risk that the pledge securities will have continuing value, a risk that is identical in nature to the risk taken by investors * * *. United States v. Gentile, 530 F.2d 461, 467.'
"This rationale might be a persuasive argument that federal securities ought to encompass pledges, as well as purchases and sales. It does little to support a decision that they do in fact cover pledges. Congress can be presume to know the difference between a collateral pledge transaction and a sale and purchase. If it had intended to cover both, it could have easily done so by words traditionally used to differentiate between the two."
The Seventh Circuit also disagreed with the broad holding of Gentile and Mallis that "any pledge is a sale," finding that those decisions adopted a literal reading of the definition, "without analyzing the legislative history or placing the definition of `sale' within the context of the Congressional concerns addressed by the securities legislation of 1933 and 1934." Lincoln National Bank v. Herber, 604 F.2d 1038, 1040, 1043 (7th Cir.1979). As that court found, "[T]he legislative history of the provisions defining `sale' also reveals no hint of a Congressional intent to regulate transactions involving a pledge of securities * * *. Though quite comprehensive, the original definition significantly did not contain any reference to pledge transactions." 604 F.2d at 1042. That revelation was not surprising, since it was "Congress's intent to regulate investment transactions * * * not commercial loan transactions." 604 F.2d 1042. The court, in Lincoln National also disparages the view of Gentile and Mallis, which contends that when a bank accepts a pledge of securities as collateral for a loan, it is assuming the same risk as an investor, and *324 said: "Risk there is, but the risk is not an investment risk. It is the ordinary commercial risk taken by any secured lender." 604 F.2d at 1043.
Furthermore, in words especially applicable to this situation, the Seventh Circuit notes that "the risk that the pledgor does not really own the collateral he purports to own exists no matter what the nature of the collateral." 604 F.2d at 1043. Finally, Lincoln National persuasively contends that the Second Circuit's literal inclusion of a pledge transaction within the statutory definition of `sale', * * * ignores the provision in both Acts that the definitions apply `unless the context otherwise requires.' Securities Act § 2 and Securities Exchange Act § 3." 604 F.2d at 1041. To label a pledge of securities a "sale" because it seems to be included in the language of the statute is to focus on the literal text,[25] and to ignore the underlying economic context of the transaction. Whether a pledgee can ever acquire the pledged securities is solely dependent on default by the pledgor of the commercial loan, not on any decision to invest.
In sum, this Court finds the reason of the Fifth and Seventh Circuits persuasive on the legislative intent of the language on the 1934 Act, as well as on its regulatory goals. Without any guidance from the Eighth Circuit or Supreme Court on the specific issue now before us to apply, this Court is convinced that the best view is that the pledge of the PWSD7 1972 bonds to Traders is not a sale within the meaning of § 10(b) of the 1934 Act. Therefore, under this theory, this Court would lack jurisdiction for Traders 10(b) and Rule 10b-5 claims.
Since this question of lack of jurisdiction because a pledge of securities is not a "sale" under Section 10(b) of the 1934 Act has not been passed on by the Eighth Circuit, and there is a split of authority with respect to holdings by the Circuits referred to above, this Court would add this lack of jurisdiction as a further basis for granting the motions for summary judgment in favor of the moving defendants against Traders.
Accordingly, the Court will sustain the five separate motions for summary judgment filed by the defendants, Reinholdt & Gardner, Stinson & Mag, Rothaus, Bartels & Earley & Company, PWSD7 and Gregory O'Shea, as to Counts I, II, III, IV and V of the plaintiff Shelter's complaint, on the ground that the statute of limitations bars recovery on the above counts of Shelter's complaint. While the SEC claims of the plaintiff Shelter are barred by the statute of limitations, insofar as the PWSD7 1966 bonds are concerned those bonds are not affected by this opinion, as PWSD7 recognizes them as valid bonds and has paid the interest due on them.
The Court will also sustain the motions for summary judgment of defendants, Stinson & Mag, Rothaus, Bartels & Earley & Company, PWSD7 and Gregory O'Shea, on Counts II and III of plaintiff-intervenor's complaint on the ground that this Court lacks jurisdiction, and further that the statute of limitations bars recovery for those counts.
Since this Court has sustained the defendants' motions for summary judgment on Counts II and III of Traders' complaint, Traders' motion for summary judgment as to those above-named defendants will also be denied.
In view of the Court's ruling above, the motion for summary judgment filed by defendant, Stinson & Mag, as to the cross-claim of defendant PWSD7, is now moot, and it will be denied.
In view of the Court's rulings above with respect to the granting of summary judgments on the counts referred to above in favor of the moving defendants against the plaintiff Shelter and plaintiff-intervenor Traders, this Court, following the directions outlined in Koke, supra, at 1345-46 (citing United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218), will dismiss the pendent state claims *325 in Counts VI, VII and VIII of plaintiff's complaint and Counts V and VI of plaintiff-intervenor's complaint as to the moving defendants in the respective motions for summary judgment.
This memorandum opinion is adopted by the Court as its findings of fact and conclusions of law, and the clerk will prepare and enter the proper orders as set out above.
This order, because it dismisses certain claims based on the statute of limitations and lack of jurisdiction and certain pendent state claims, involves controlling questions of law as to which there is substantial ground for difference of opinion. An immediate appeal from this order may materially advance the ultimate termination of this litigation. There is no just reason for delay of this appeal. This order shall constitute a final judgment as to the claims decided herein.
It is the intention of this Court that this order meet the alternative requirements of both Rule 54(b) and 28 U.S.C. § 1292(b) so as to assure the parties the means of obtaining an expedited appeal of the claims decided herein. All remaining proceedings in this Court shall be stayed pending the resolution of the issues presented in this order by the Court of Appeals. The clerk of the Court is directed to enter judgment upon this order.
NOTES
[*] Includes all individuals named as defendants in connection with the entity named.
[1] In this memorandum we are concerned primarily with those defendants that filed motions for summary judgments.
[2] Missouri Uniform Securities Act, Mo.Rev. Stat. 409.411(e) (1969).
[3] In reviewing the facts with respect to the motions it is inescapable that this fraud was successfully perpetrated not because P.A.L. was so extraordinarily clever, but because so much that could have been done by the parties involved, was not.
[4] Reinholdt & Gardner is not a defendant insofar as the plaintiff-intervenor is concerned.
[5] Shelter purchased the 1966 PWSD7 bonds in 1978 in the principal face amount of $100,000.00, and have inappropriately included them in their claims, though these bonds are not in default like the 1972 bonds, nor is their validity disputed by PWSD7.
[6] Much is made by Shelter and Traders of the fact that Stinson & Mag enclosed in this packet an undated bond opinion, although Powell did not attend the bond closing. However, since neither Shelter nor Traders bought the bonds or accepted them as collateral respectively, on the basis of the Stinson & Mag opinion, then it appears rather unjustified for both of them to point to the Stinson & Mag opinion as a basis of their claim.
[7] A position that included "the job of handling and making decisions to buy and sell investments with an investment committee." (Keithley Depo p. 7.)
[8] The investment committee consisted of four other Shelter officials besides Keithley.
[9] Keithley has conceded that he never asked Clark whether or not this investment was a safe one.
[10] As a sophisticated investor he was aware that the value of an unrated bond can best be determined with specific knowledge of the credit of the issuer.
[**] All interest paid on the PWSD7 1972 bonds was paid by P.A.L. to the paying agent until the payment due September 1, 1980.
[11] As to the other count involving common law fraud, the court vacated the ruling below and remanded with instructions to dismiss without prejudice.
[12] The facts about this "normal banking relationship," would not, if widely disclosed, inspire much confidence in the banking industry.
[13] Traders incorrectly and consistently refers to this case as "Kike" in its voluminous pleadings.
[14] Stallard is presently associated with Centerre Bank of Kansas City, formerly the Columbia Union Bank.
[15] Eufala was a company used by P.A.L. in Oklahoma. It was involved with the same Keystone and McIntosh authorities which issued the bonds that were the subject of Shelter's security fraud law suit that Shelter brought in Oklahoma in 1976.
[16] Stallard conceded in his testimony that it is "not an accepted practice" to allow bond certificates to remain in the collateral file with past years' coupons still attached, because the coupons are equal to cash." (Stallard Depo, Vol. II, p. 56)
[17] The appraisal was worth about what Buckner charged for it  which was nothing.
[18] See Plaintiff's complaint, Count II.
[19] Of the three-count indictment, at trial Rubin was convicted of the Count I conspiracy charge, acquitted on the Count II § 17(a) federal security fraud, and on the third count, of fraud in a bank loan application, 18 U.S.C. § 1014, that count was dismissed before the jury reached a verdict, 449 U.S. at 427, n. 4, 101 S.Ct. 700, n. 4.
[20] By holding that the pledges of stock were offers or sales under § 17(a), the Supreme Court was thus able to uphold the conviction of Rubin, who was the actual perpetrator of the security and other fraud.
[21] Mallis v. FDIC, 568 F.2d 824 (2nd Cir.1977), cert. granted 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243, cert. dismissed as improvidently granted sub nom. Bankers Trust Co. v. Mallis, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978), United States v. Gentile, 530 F.2d 461 (2nd Cir.1976), cert. denied 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388, Mansbach v. Prescott, Bell & Truben, 598 F.2d 1017 (6th Cir. 1979).
[22] First Natl Bank of Commerce of Dallas v. All American Assurance Co., 583 F.2d 1295 (5th Cir.1978), Alley v. Miramon, 614 F.2d 1372 (5th Cir.1980), Lincoln Natl Bank v. Herber, 604 F.2d 1038 (7th Cir.1974).
[23] Krebs v. Fall Rivers Industries, Inc., 502 F.2d 731 (10th Cir.1979).
[24] Both cases were brought under § 17(a) of the 1933 Act, while National Bank was brought under § 17(a) of the 1933 Act and § 10(b) of the 1934 Act, 583 F.2d at 1299.
[25] The statutory phrase defining "sale" in the 1934 Act is: "Sale * * * [shall] include any contract to sell or otherwise dispose of." § 3 of the 1934 Act, 15 U.S.C. § 78c(a)(14).